UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:

MUNCE'S SUPERIOR PETROLEUM PRODUCTS, INC.,

Debtor.

Chapter 11

Case No. 11-10975

# AFFIDAVIT OF HAROLD P. MUNCE IN SUPPORT OF FIRST DAY MOTIONS

I, HAROLD P. MUNCE, being duly sworn, depose and say:

1. I am a shareholder, member of the Board of Directors and the President and Treasurer of: Munce's Superior Petroleum Products, Inc. ("MSPP"); Superior Trucking, Inc. ("Superior Trucking"); and Gorham Oil, Inc. ("Gorham Oil"). I am also a Member and Manager of: BMRA Real Estate Ventures, LLC ("BMRA"); and Munce's Real Estate Ventures, LLC ("MREV").[1]

2. On March 16, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Hampshire. The same day, the following motions were filed (collectively, the "First Day Motions"):[2]

   a. Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion");

   b. Motion For Order: (A) Authorizing the Debtor to Obtain Post-Petition Financing; (B) Granting to Northway Bank Post-Petition Security Interests; (C) Authorizing the Use of Cash Collateral; (D) Granting Adequate Protection in the Form of Replacement Liens; and (E) Setting A Final Hearing (the "Borrowing and Cash Collateral Motion");

---

[1] MSPP, Superior Trucking, Gorham Oil, BMRA and MREV shall be collectively referred to herein as the "Debtors."
[2] All of the First Day Motions were filed in MSPP's bankruptcy case and at least three of the First Day Motions were filed in each of the other four bankruptcy cases.

c. Motion for Authority to Pay Pre-Petition Employee Wages and Salaries and to Make Payments for Which Payroll Deductions are Made (the "Payroll Motion");

d. Motion for Approval of Cash Management System and for Authorization of Use of Prepetition Bank Accounts and Business Forms ("Cash Management Motion");

e. Motion for Order Authorizing, But Not Directing, Payment of Certain Prepetition Taxes (the "Taxes Motion");

f. Motion for an Order Authorizing, But Not Directing, Certain Prepetition Payments To Critical Vendors (the "Critical Vendors Motion");

g. Motion for an Order Authorizing, But Not Directing, the Debtor to (I) Honor Certain Prepetition Obligations to Customers, and (II) Continue Its Prepetition Customer Policies and Promotional Programs (the "Customer Programs Motion");

h. Motion for Order, Pursuant to Rule 1007(c) of the Federal Rules of Bankruptcy Procedure, Extending Time to File Schedules and Statement of Financial Affairs (the "Schedules Motion"); and

i. Motion for Expedited Hearing and Approval of Shortened Objection Period with Respect to Certain First Day Motions (the "Motion to Expedite").

This Affidavit is submitted in support of these First Day Motions, which are described in greater detail below.

3. All facts set forth herein are based on my personal knowledge, on information supplied to me by others within the Debtors' organizations, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and present liquidity needs. If I were called to testify, I could and would testify competently to the facts set forth herein. Part I of this Affidavit describes the business operations and backgrounds of the Debtors, and Part II sets forth facts relevant to each of the First Day Motions.

I. **Description of Debtors' Businesses and Backgrounds**

4. MSPP is a family-owned and operated business that has served northern New England for more than forty years. The company began as a garage, gas station and fuel

2

company, and has grown steadily over the years. As of the Petition Date, MSPP operated eight convenience stores and truck stops located throughout New Hampshire on property it leases from real estate holding companies BMRA and MREV and, in some instances, from my wife, Marilyn Munce, and me.

5. MSPP also delivers heating oil and propane to residential and commercial customers, and supplies various lubricant products to service garages, car dealerships and municipalities all over northern New England, from Bangor, Maine, to Burlington, Vermont, and almost as far south as Boston, Massachusetts. To deliver these products, MSPP leases box trucks and tanker trucks from Superior Trucking, which is primarily a holding company in the business of purchasing, maintaining and leasing a fleet of trucks.

6. In addition, MSPP operates a 24-hour burner maintenance and repair service, and distributes fuel to some wholesale customers. Finally, MSPP operates a campground located on property adjacent to one of its convenience stores in Lancaster, New Hampshire. The campground consists of approximately ninety camping spaces.

7. Gorham Oil operates two additional convenience stores and also makes some home heating oil deliveries.

8. Pre-petition, MSPP entered into a hedge contract with Sprague Energy for the supply of number two heating oil at a fixed price. In 2008, the price of home heating oil dropped precipitously but, due to the hedge contract, MSPP was unable to lower its prices to a competitive level. As a result, customers who were not locked into a pre-buy contract with MSPP took their business elsewhere, and even many of the customers who had entered into such contracts with MSPP breached those agreements in an effort to find less expensive sources for oil. Eventually, MSPP lost more than $1 million in revenues as a result of the hedge.

9. Moreover, several local businesses that purchased oil from MSPP and Gorham Oil closed their doors as a result of the recent economic downturn. In 2009, MSPP and Gorham Oil delivered 100,000 gallons of fuel a day, or ten full tanker trucks. As of the Petition Date, however, these Debtors were dispatching just two tanker trucks per day for deliveries.

10. In addition to eroding the customer base, the closures forced MSPP and Gorham Oil to write off a number of significant accounts receivable which remained unpaid. Over the five years leading up to the bankruptcy filing, MSPP wrote off more than $3 million of uncollected receivables. These losses were increasingly covered by additional borrowings, leaving the Debtors even more vulnerable to the effects of the recession.

11. The lost business and revenues made it increasingly difficult for MSPP to meet its obligations as they became due, including with respect to certain state road toll taxes and oil discharge fees owed to the State of New Hampshire. As a result of these unpaid taxes and fees, the State of New Hampshire revoked MSPP's motor fuel distributor's license, replacing it with a transporter's license held by Superior Trucking.

12. The transporter's license issued to Superior Trucking required that entity to pay all taxes immediately upon receipt of fuel from the supplier, in contrast to the distributor's license, which permitted MSPP to pay taxes one month after receipt of the fuel. However, for the first few months after MSPP's distributor's license was revoked, the terminals where Superior Trucking received fuel failed to charge the taxes upfront. In November 2010, the State of New Hampshire commenced an administrative proceeding whereby it sought to suspend Superior Trucking's transporter's license due to its failure to timely pay the required taxes.

13. MSPP's bonding company, NGM Insurance Company ("NGM"), eventually paid the amounts owed by MSPP to the State of New Hampshire. NGM then obtained a writ of

attachment against the Debtors, among others, in the amount of $600,000.00 and in relation to the payments made to the State on behalf of MSPP.

14. After a series of negotiations, the State of New Hampshire agreed to extend the date on which Superior Trucking's transporter's license would be suspended to March 14, 2011. On March 11, 2011, Superior Trucking paid the approximately $50,000.00 owed to the State of New Hampshire on account of outstanding tax obligations, thereby preserving its transporter's license.

15. Although the taxes relating to the transporter's license have been paid, certain of the Debtors continue to face litigation commenced by the New Hampshire Department of Environmental Services relating to allegations that certain of the Debtors' above-ground fuel storage tanks are not in compliance with applicable regulations. The costs of defending against this litigation, compounded with the revenue losses described above, have made it increasingly difficult for all five entities to meet their obligations with respect to various pre-petition loans. When the attachment prevented MSPP from obtaining additional financing, it became necessary for all the Debtos to file for chapter 11 relief.

16. The Debtors intend to restructure their debt and reorganize their operations so they can emerge from chapter 11 as operating entities. As part of that reorganization, the Debtors may sell certain assets in an effort to streamline their operations and reduce their debt service.

## II. The First Day Motions

17. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the motions is necessary if the Debtors are to operate in

chapter 11 with a minimum of disruption. Ultimately, those motions will be critical to the Debtors' ability to achieve a successful reorganization.

*A.    Joint Administration Motion*

18.    The Debtors seek joint administration of their chapter 11 cases for procedural purposes only.

19.    As demonstrated by the backgrounds provided above, the Debtors are independent but related entities.  There are a number of intercompany obligations and the Debtors' operations are integrated.  As a result of these close relationships, the creditor matrices for the various Debtors overlap significantly and many creditors will be interested in the developments in multiple cases.  For instance, Northway Bank ("Northway") and Passumpsic Savings Bank ("Passumpsic"), the Debtors' two primary secured creditors, each hold claims against multiple debtors as a result of various commercial guarantees and cross-collateralization provisions.  Joint administration will ensure that all creditors are simultaneously apprised of all pleadings in each case.

20.    In addition to maximizing creditors' access to information in these cases, joint administration will better preserve the Debtors' estates by avoiding otherwise unnecessary and expensive duplication associated with preparing, and serving creditors with, multiple sets of differently-captioned, but otherwise identical, pleadings.

21.    Finally, some creditors may be uncertain as to which debtor-entity is their obligor. By jointly administering the estates, creditors will receive notice of all matters involving all of the Debtors, thereby ensuring that they are fully informed of matters potentially affecting their claims.

B.  *Borrowing and Cash Collateral Motion*

22.  The Debtors also seek authority to enter into a post-petition revolving line of credit with Northway of up to $300,000 (the "DIP Loan"). The DIP Loan proceeds will be used to pay certain costs and expenses identified in the budget attached to the Borrowing and Cash Collateral Motion as **Exhibit B** (the "Budget"). The critical expenses include payments for post-petition payroll and vendor and supplier costs. Absent this relief, the Debtors will be forced to cease their operations and the going concern value of their assets will decline precipitously.

23.  In consideration for the DIP Loan, the Debtors seek authority to grant Northway liens on all of their assets. To the extent that any of those assets are already encumbered, the new liens will be junior to the existing liens. Accordingly, Passumpsic and other secured creditors are adequately protected.

24.  The Debtors' inventory and accounts receivable, as such collateral existed on the Petition Date, are subject to liens in favor of Northway Bank and Passumpsic. The Debtors seek authority to use amounts existing in their bank accounts as of the Petition Date and generated post-petition (the "Cash Collateral") in the ordinary course of business, and to the extent shown in the Budget. To protect the interests of Northway and Passumpsic, the Debtors propose to grant those lenders a continuing, post-petition security interest in the Cash Collateral, of the same nature and to the same extent as their pre-petition liens.

25.  The Debtors hope to reorganize and emerge from bankruptcy. While their reorganization may include the sale of some or all of the Debtors' assets, their ability to continue to operate their businesses in the early stages of this case is critical to the preservation of their going concern value. Absent the relief requested in the Borrowing and Cash Collateral Motion, the Debtors will be forced to cease operations and sell their assets in an early liquidation, to the

detriment of all of their creditors. Despite a diligent search, the Debtors are unable to obtain financing on terms more favorable to those offered by Northway in connection with the DIP Loan.

C. *Payroll Motion*

26. MSPP and Gorham Oil, the only debtors with any employees, each distribute paychecks every Thursday to pay wages and salaries for the prior week. Three employees receive their salaries and/or wages by direct deposit, which typically funds on Wednesday. Each weekly pay period begins on Sunday and ends on Saturday.

27. MSPP and Gorham Oil filed their petition on Monday, March 16, 2011. Payroll relating to the pay period beginning March 6, 2011 and ending March 12, 2011 (the "First Compensation Period") will be due for employees receiving direct deposit on March 16, 2011, and all other employees on March 17, 2011.[3]

28. Payroll for the period beginning March 13, 2011 and ending March 19, 2011 (the "Second Compensation Period") will come due on March 23 and 24, 2011. The Second Compensation Period will include both pre- and post-petition wages and salaries.

29. MSPP and Gorham Oil seek authority to pay wages and salaries arising during the First Compensation Period and the Second Compensation Period in accordance with their typical business practices, because any delay in paying prepetition compensation will damage those Debtors' relations with their employees and will otherwise harm morale. If payroll is not timely paid, employees will suffer undue hardship and, in many instances, suffer financial difficulties because these sums are necessary to enable the employees to meet their own personal obligations. Many employees would undoubtedly seek other employment if not paid, forcing the

---

[3] The direct deposit payroll is being withheld until this Court has had an opportunity to rule on the First Day Motions at the hearing scheduled to occur on March 17, 2011.

management teams for MSPP and Gorham Oil to spend valuable time and effort hiring and training new employees, thereby diverting focus away from reorganization efforts.

D.   Cash Management Motion

30.   MSPP and Gorham Oil each operate a cash management system (collectively, the "Cash Management Systems"). These systems enable the Debtors to receive credit card payments, pay critical vendors and suppliers, and participate in the New Hampshire State Lottery Commission's lottery programs. In the aggregate, the Cash Management Systems include seventeen different accounts at two different banks. Those accounts are tied into certain third party accounts through funds which are electronically deposited and withdrawn – often on an automatic basis.

31.   The Cash Management Systems have been utilized for years and constitute customary and essential business practices. If MSPP and Gorham Oil were forced to change their cash management systems, they would suffer unnecessary disruption to their operations, hampering their ability to make a relatively seamless transition into chapter 11. Any new remittance procedures would likely lead to confusion and delay in making payments to vendors, suppliers, and the New Hampshire State Lottery Commission. In addition, a large percentage of MSPP's and Gorham Oil's customers pay using credit cards. If these Debtors are forced to open new accounts, there will be significant disruption to their business while the credit card machines are tied into the new accounts.

32.   In addition, MSPP and Gorham Oil also request that they be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices) and checks existing immediately before the Petition Date without reference to their status as debtors-in-possession. Parties doing business with MSPP and

Gorham Oil undoubtedly will be aware of their status as debtors-in-possession as a result of press coverage and noticing.

33. Moreover, if MSPP and Gorham Oil were required to change their correspondence, business forms and checks, they would be forced to choose standard forms rather than the current forms with which MSPP's and Gorham Oil's employees and customers are familiar. Such a change in operations would create a sense of disruption and potential confusion with those organizations and their customers.

34. MSPP and Gorham Oil believe that it would be extremely costly and disruptive to cease using all existing forms and to purchase and begin using new stationary, business forms and checks. MSPP and Gorham Oil respectfully submit that to do so would be unnecessary and that appropriate care can be taken to assure the proper use of the existing forms.

35. Notwithstanding the foregoing relief, after MSPP and Gorham Oil exhaust their current supply of checks, they will have new checks printed with the designation "DIP" or "Debtor in Possession," if the U.S. Trustee so requires.

  E. *Taxes Motion*

36. The Debtors' normal business operations result in the collection of State rooms and meals taxes and surcharges from their customers, which taxes and surcharges are subsequently remitted to the applicable taxing authorities. As of the Petition Date, the estimated aggregate amount of the Debtors' accrued and unpaid rooms and meals taxes and surcharges is approximately $4,386.00. If these taxes are not paid, liens can attach to the real and personal property with respect to which the Debtors have unpaid rooms and meals taxes, thereby entitling the taxing authorities to postpetition interest or other adequate protection.

37. Furthermore, monetary penalties may be imposed for failure to make timely payment, and the Debtors' management could also be subject to collection efforts and litigation, which could prove to be a substantial distraction from the management of the Debtors.

38. Accordingly, the Debtors seek authority to pay these accrued and outstanding prepetition taxes, and an order authorizing and directing applicable banks and financial institutions to process and pay all of the Debtors' deposits, wire transfers, and checks that may not have cleared prior to the Petition Date relating to the payment of such taxes.

39. Payment of these taxes will not prejudice any of the Debtors' secured or unsecured creditors, and will ensure that the Debtors can avoid the potential penalties and liabilities associated with the nonpayment of such taxes.

F. *Critical Vendors Motion*

40. MSPP seeks authority to pay or honor the prepetition claims of certain critical vendors which supply material crucial to MSPP's business operations. In most cases, the vendors identified on Exhibit A to the Critical Vendors Motion are the only vendors licensed to distribute certain products to the geographical area in which MSPP's operations are located. MSPP is not able to compel these vendors to perform on a timely basis pursuant to contracts or otherwise. Furthermore, these vendors are unwilling or unable to continue to supply MSPP without receiving payment of prepetition claims.

41. Additionally, MSPP seeks authority to continue an "open account" relationship with each of the critical vendors identified in the Critical Vendors Motion in order to minimize disruption to the Debtors' operations, preserve value, and ensure the continuity of the Debtors' product line.

42. MSPP respectfully submits that the relief requested in the Critical Vendors Motion is necessary and essential to the continued operation of its business and the preservation if its estate.

G. *Customer Programs Motion*

43. In the ordinary course of business, MSPP and Gorham Oil use certain customer accommodation programs and practices, some of which are based on prepetition agreements regarding the Debtors' products and services. Specifically, MSPP and Gorham Oil allow their customers to prepay seasonally for heating oil, propane, and kerosene at fixed market prices. Additionally, MSPP and Gorham Oil also participate in budget plan programs whereby customers make fixed monthly payments to the Debtors, which payments are then applied to heating oil deliveries.

44. In order to maintain the loyalty and continued patronage of the Debtors' customers, MSPP and Gorham Oil require the authority to honor these prepetition customer programs. MSPP and Gorham Oil anticipate that, without the relief requested in the Customer Programs Motion, the stability of their businesses would be undermined and otherwise loyal customers would terminate their relationships with MSPP and/or Gorham Oil in favor alternative sources for their heating fuel.

H. *Schedules Motion*

45. The Debtors also seek an order extending the time within which they must file their schedules and statements of financial affairs to sixty (60) days from the Petition Date.

46. All five of the Debtors are affiliated but separate entities operating related businesses. As a result, there are intercompany claims and claims on which multiple Debtors are jointly or contingently liable. The Debtors own numerous parcels of real property located

throughout New Hampshire and own extensive personal property, substantially all of which has been pledged as collateral securing, in many cases, multiple loan and guaranty obligations. The Debtors also collectively maintain more than seventeen bank accounts.

47. The Debtors have limited financial and administrative staff. That staff will be occupied by efforts to stabilize the Debtors' businesses, and by dealing with vendors and customers, during the first several weeks post-petition. Accordingly, the Debtors anticipate that it will take significantly longer than the fourteen days provided by Rule 1007(c) of the Federal Rules of Bankruptcy Procedure to prepare accurate Schedules.

I.  *Motion to Expedite*

48. The Debtors require immediate relief on the motions discussed above in order to facilitate a smooth transition into chapter 11 and to enable the Debtors' officers, managers and administration to focus on immediate challenges in the early stages of these chapter 11 cases. Accordingly, the Debtors are seeking an expedited hearing on the First Day Motions.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE FOLLOWS]

Dated: March 4, 2011                         _____
                                             Harold P. Munce

STATE OF MAINE
CUMBERLAND, SS.

    Personally appeared the above-named Harold P. Munce and acknowledged the foregoing to be true to the best of his personal knowledge, information and belief.

                        Before me,

                        _____
                        Notary Public
                        My commission expires: 10/21/17

                        AUDREY L. CUMMINGS
                        Notary Public, Maine
                        My Commission Expires October 21, 2017